Mr. Wesson. Thank you. May it please the Court, I rise today representing the State of Iowa Attorney General Brenna Bird and the state defendants. The United States and Iowa are facing an immigration crisis. Responding to that unprecedented crisis, Iowa enacted a state crime of illegal reentry. But the District Court, without the benefit of this Court's recent case in GLBT Youth v. Reynolds, where the Supreme Court case Moody v. Net Choice entered a facial pre-enforcement injunction enjoining enforcement of the entire law. Moody v. Net Choice said that winning a facial injunction is a choice and it makes the job of the plaintiffs hard. Moody went further to say that outside of the context of Moody itself and GLBT Youth, both of which occurred in the First Amendment context, in the other context the burden is on the plaintiffs to show that there is no lawful application of the law before such a facial injunction is justified. GLBT Youth went one step further with regards to Iowa law in that GLBT Youth accepted the state's understanding that Iowa Code Chapter 4 codified rule of interpretation to read Iowa law to be consistent with federal law when possible. This court also held invesely that if an application of a law to the statute, sorry, held that all applications of a law must be unconstitutional or forbidden before allowing a facial injunction to proceed. There are largely four reasons that I'm going to address today why the District Court's facial pre-enforcement injunction should be First relies on the majority opinions in Arizona and Kansas against the United States. Second relies on Iowa Code Chapter 4. And then third and fourth are kind of combined and deal with the issue of standing and cause of action. But ultimately I think my friends and I agree that this court's understanding of Arizona is going to be informative for how this case comes out. So I'd like to start with Arizona. Arizona addressed four challenged parts of an Arizona statute that dealt in the space of illegal immigration and state crimes and state actions relating to illegal immigration. One of those areas of law was field preempted dealing with alien registration. Two were conflict preempted one of which dealt with police arrests relating to removal. And one was allowed to go into effect. I'd like to start there. There the Supreme Court while acknowledging that the state law section 2 could be enforced in a manner that is inconsistent with that conflicts with federal law or even the Constitution should be allowed to go into effect. And that states and state courts should be afforded the grace to allow the law to go into effect before enjoining it facially in a pre-enforcement posture. The other three sections can be distinguished. First is the alien registration section which is at the heart of my friend's argument on the other side for field preemption. Alien registration has a different history than much of the rest of immigration law. Hines against Davidowitz the US Supreme Court case in 1941 outlined that history. That history was reflected again in the Arizona case dealing with section 3 and touched on in the majority in Kants against Garcia. Alien registration itself is field preempted but Arizona declined to extend that field preemption to the other three challenge sections of the law despite the United States asking it to do so. One of those sections of the law relating to whether Arizona state law enforcement was authorized to preemptively arrest those suspected of being removable was conflict preempted. That's important because here my friends on the other side contend that anything that touches on removability is itself field preempted. Also in Arizona... Doesn't removability require an arrest usually? Am I following your argument? Sorry at some point removability does require an arrest but to the extent... So then is it back under Arizona? That's my, you know where I'm going. Go ahead. Yes and this case does not touch on either removability or entry. The limited issue made a crime under Iowa law is illegal re-entry and then refusal to comply with an order to return. The order to return itself is separate from a removal order for a few important reasons. The first of which is that the order to return requires the state to present the convict after the crime has been served or in the case in some cases earlier in the case if it's voluntary to a port of entry. And at the port of entry then the federal government can decide what it would like to do. As this law has not been in effect it's not clear how the law or what cooperation will ensue between the federal government at the port of entry and the state. That's something that likely would have to be worked out. But there would have to be an arrest at some point right? There would have to be an arrest but the arrest would not have to solely be for the crime of illegal re-entry and because this is a facial injunction of pre-enforcement posture all applications of the law would have to be found to be unlawful. One example I'd submit to the court is if someone had been earlier deported from the United States, re-entered and committed a murder and during the course that trial or during the course of the charging that person was charged both with murder and with the crime of illegal re-entry. It seems odd first to say that the foreign policy interests of the United States would be affected by the illegal re-entry lesser charge but not by the And it also seems odd to say that if assuming that there is no lawful reason for that person to be in the United States that charging that person and convicting him of illegal re-entry would itself be a violation or a conflict with federal law. And it seems odd to suggest I don't believe that the United States has yet said that if such a person after serving a sentence for murder was issued in order to return and presented at the port of entry that this recently released murderer would be turned away and that federal authorities would be unwilling at that point to cooperate. But let's say they are under current policies. I don't believe that there's anything in federal law that prohibits such cooperation. Either this administration or another administration could have a different perspective on that. And what the U.S. Supreme Court explained in Kansas against Garcia is that just because the states and federal government legislate in a way that overlaps and in that case it was a state criminalizing certain conduct that the federal government had also criminalized. It said that there's overlap but that doesn't necessarily mean conflict and that reading such an overlap to mean conflict would turn the entire federal system on its head. And that assumes there's no field preemption, right? Yes, your honor. And I'm with you. Okay. Yeah. And when it comes to field preemption again I just want to stress that the U.S. Supreme Court declined to apply field preemption in Kansas against Arizona despite that argument being squarely presented and the argument being that because Kansas had been legislating in an area that was an occupied field that it was unable to criminalize the conduct in that case. The U.S. Supreme Court declined. Interestingly in Arizona itself all of the justices that took part in consideration of the decision agreed with the analysis relating to 2C or at least no one dissented from that analysis. Everyone agreed that the general course it's proper to allow a state law to go into effect that even if there's a potential for conflict unless that conflict is unavoidable the law should be allowed to go. In the dissents or partial dissents there were three. Two of the justices Scalia and Thomas dissented from all of the parts of the preemption analysis but Justice Alito who later wrote Kansas against Garcia agreed with field preemption in the specific case of alien registration and there's a reason for that. The unique history of that section of law has which has been explained in both Hines Arizona and Kansas sets it apart from the rest of the INA and if the INA generally meant that when there's any sort of overlap between a state law and a federal law that that means that preemption must follow then Kansas wouldn't necessarily make sense but also Arizona itself could have been much shorter because the two parts of the conflict preemption analysis could have been dealt with simply by saying there is an overlap here states are not allowed to intrude on a federal prerogative and this is field preempted. I'd like to turn shortly now to the cause of action and standing issues in the case which are admittedly fairly complicated. My understanding is that the United States before the decision at the Fifth Circuit in the text against the United States case had never before used ex parte young as a font of equitable or an alternative to equitable relief. It's not clear to me that the United States is a proper plaintiff in an ex parte young case and when it comes to the MMJ plaintiffs in standing I'd like to highlight that the state's position is that anyone who's had a final adjudication that they are lawfully in the country cannot be prosecuted under the statute and if such a prosecution were to proceed that section 6 requires it to be abated which if anything is stronger than an affirmative defense that means the suit must end. Two of the plaintiffs are lawfully in the country one of the additional members of MMJ is lawfully in the country at this point due to asylum and the last member did not sufficiently plead in his declaration facts that would lead us to believe that he is susceptible to suit under the state's interpretation of how the law applies. I've reserved the rest of my time for rebuttal unless there are any further questions. You may. Thank you. Mr. Overvalt. Good morning, your honors. May it please the court, Leif Overvalt on behalf of the United States. I work at counsel's table on Ms. Winger who will be presenting argument on behalf of the private plaintiffs here. I guess I'll start as Iowa did with Arizona because I do think that is the key Supreme Court president here. In Arizona the Supreme Court held that a provision of Arizona law purporting to mirror a federal crime of relating to the registration of non-citizens was preempted by the federal immigration laws. It held that another provision purporting to give Arizona a unilateral authority to arrest non-citizens based on suspected removability was conflict preempted. In this case Iowa's S of 2340 in both directions goes further than the Arizona law that was held preempted by the Supreme Court. It purports to create a state crime mirroring the federal crime of illegal reentry and to authorize state court judges to issue orders directing a non-citizen to return to the country from which they've entered the United States. We take the point that non-citizen registration and reentry and removal, they're different fields, but reentry and removal are the core entry and removal are the core of what has long been held for almost 150 years to be the exclusive federal power to control immigration. The Fifth Circuit in addressing a Texas law that is materially identical in relevant respect to the Iowa law held that it was field preempted and conflict preempted. It recognized that when you're thinking about field preemption, entry, admission, and removal of non-citizens, that is the core of the federal power which has been, it has a different history, but that history is it's an exclusive federal power for almost 150 years. As with non-citizen registration, when you look at the framework that the INA creates for regulating entry and removal, it creates a comprehensive framework that again, both as the Fifth Circuit recognized, sets the conditions how, which non-citizens may enter, how and where they may enter. It sets penalties for non-compliance. It's a comprehensive framework. I mean, when you're thinking about field preemption, it's both whether there's a dominant federal interest or a pervasive regulatory framework that does not allow the state's room to supplement. You have both of those as entry and removal here. On conflict preemption, the Supreme Court concluded that the crux of the problem with the arrest provision in that case was it allowed the state to achieve its own immigration policy and under no coherent understanding could be understood to represent the state cooperating with the federal government and immigration enforcements. Again, a unilateral prosecutorial authority and the authority to issue return orders, that goes further than a unilateral arrest authority. It's also conflict preempted under the logic of Arizona. If the court has no further questions, I mean, on the likelihood of prevailing merits, we think the district court properly issued a preliminary injunction that preserves the status quo that has existed in this area for over a century. Just to briefly touch on the cause of action issue, but I think that's actually slightly a misnomer. I mean, just the United States' ability to sue for equitable relief in a case like this. I'm surprised that I would not address this court's decision in Missouri a month ago. It held that the United States could sue to enjoin implementation of a preempted law. It's an identical context, the same tradition of equitable relief that allowed the United States to sue in this case also allowed it to sue there. They haven't tried to distinguish it. I think to the extent I understood a distinction, it's maybe that there's a difference in the defendants, but in both cases we sued the state of Iowa and official capacity defendants, so there's no distinction there. I think the only other thing I guess I would add, my friend distinguished the return orders here from a removal order, but on the face of the statute it's an order directing a non-citizen to return to a country from which they entered the United States, which very well might not be the country that would be selected if the federal government was removing someone. There's no basis for concluding that country is accepted, well accepts the non-citizen. It has all the foreign policy implications that the Supreme Court in Arizona made clear you have to speak with one voice on removals. I'm happy to answer any other questions the court has, otherwise I will cede the rest of my time to Ms. Winger. Thank you for the argument, Ms. Winger. Good morning, Your Honor, and may it please the court. Emma Winger on behalf of plaintiffs Jane Doe, Elizabeth Rowe, and Iowa Migrant Movement for Justice. Defendant here ignores the fundamental principle going all the way back to 19th century Supreme Court cases like Ishimura and Fang Yuting, underscoring that the control of core immigration functions of entry and removal are inherent to federal sovereignty and granted to the federal government who has exclusive control over foreign affairs. To permit Iowa, states like Iowa and Texas and Oklahoma and Arizona and Florida to enter their own laws regulating entry and removal is obviously unworkable. We have a 50-state patchwork of different rules and different procedures that would create pure chaos, but it also strikes at this core sovereignty interest. What is the irreparable harm in your case? Yes, Your Honor. Here, each of our plaintiffs under the plain terms of the statute face the threat of arrest, prosecution, and an order to return. Don't we have cases that suggest potential prosecution alone is not enough to show irreparable harm? Your Honor, I point this court to Alexis Bailey Vineyards, where the court says that where an individual is subject to enforcement under the plain terms of the statute, that enough is sufficient sufficient injury for purposes of standing here. So that's the case, the sole case, well that's the key case you rely on for irreparable injury. Well, Your Honor, we'd cite to a number of our cases in our briefing about that, but here we're not just talking about arrest, we're talking about prosecution, we're talking about an order to return to a foreign country, we're talking about separation from family, and we're talking about deprivation of a constitutional interest here that's reflected in the Supremacy Clause, and you know, it's something that plaintiffs here have a right to vindicate. Your Honor, I would like to turn to the harms that our plaintiffs suffer here, and the impact of this law if it were permitted to go into effect. You know, here, Iowans who have long community ties to this country, including Iowans who are members of mixed-status families, who have U.S. citizen spouses or children, who have long roots in this country, again face the threat of prosecution and removal. Your Honor, I think it would be helpful to talk about how this law would operate in practice, and a good way to do it, even under the state's construction. And a good way to do so is to focus on an Iowa MMJ member, Anna. This is the high school student who was granted asylum recently. She was brought to the United States as a child by her mother, fleeing persecution. She was deported as a child and returned unlawfully as a child. Even under the state's construction of the statute, up until the point that there was a final determination on her application, she could have been arrested, prosecuted, and ordered to return to Mexico, not her native country. Isn't her case moot by the way you describe it? No, Your Honor. Because now she's legal, right? Your Honor, under the plain terms of the state's construction that the state courts will not... I see. Yeah, they say they're going to interpret it constitutionally. Go ahead. But Your Honor, she illustrates how this law would work, even under the state's construction, even if we disagree with the state's construction. What do you have a plaintiff? You have a plaintiff who's in danger, but the state's made-for-repeal construction about interpreting the statute constitutionally. So this court and the Supreme Court and the Iowa Supreme Court have all emphasized that where the plain terms of the statute are unconstitutional, this court isn't free to rewrite the statute. The state's reliance on 4.4 is unavailing here. They cite multiple cases in their reply that make clear that the presumptions in 4.4 don't permit overriding the plain terms of the statute in either site. They cite In re Younger, State v. Doe, State v. Gross. All of those case laws, all of that law shows that they can't overcome what the statute criminalizes here. All of our plaintiffs and MMJ members here are individuals, non-citizens. They are all people who have been deported and they can all be prosecuted under this statute. The human harms at issue here, the Supreme Court in Arizona made clear, are not only relevant to reparable harm. They're also core part of the substantive and procedural protections that Congress put in place in its complex immigration scheme here. The Iowa non-citizens are entitled to count on the fact that immigration law will be enforced by federal immigration experts trained in immigration law so that the rules don't change. I don't think you want to go into enforcement here, right? We want to stick with the law? Enforcement, I assume there's not a record on enforcement either, right? Because you know that's what Iowa laces their brief with is references to the non-enforcement of these laws you're talking about. Understood, Your Honor, but they have also promised to enforce the law. And so how this law would be implemented if allowed to go into effect, we do think is relevant here. But of course, it is in every application. So they say that there may be special applications where it wouldn't be unconstitutional, but we would say no in every application. And that's because, of course, it's facially preempted. But also the conflicts that are inherent in the scheme apply regardless of how in every application. The conflict that we're talking about here is conflict with the complex enforcement scheme that Congress has put in place. And Congress gave the federal government all the tools to regulate entry, including the mechanisms for return, the civil and criminal consequences of illegal entry, and also the power of prosecutorial discretion to decide not to enforce for any number of reasons, including the particular foreign policy implications of a particular application. Here, the conflict is just like the conflict in Arizona with respect to Section 6. Finally, I'd just like to return to what is really the central question here, which is whether the field of entry and removal is either one of a dominant federal interest or one of pervasive federal regulation. Defendants still have no response to the 150 years of Supreme Court case law saying that the field of entry and removal is one of overwhelming federal dominance, core to sovereignty and inextricably intertwined with foreign affairs. And they have no response to the pervasive federal regulation within this space. Applying that standard, SF-2340 is plainly preempted. If your honors have no more questions. Seeing none, thank you for your argument. Mr. Wesson. Thank you, your honors. I'd like to start by responding where purportedly we have no response with Arizona's dealing of with Arizona's Section 6. That was a statute that dealt with state law enforcement officers making preemptive determinations based on whether they believed someone was removable. And the U.S. Supreme Court said that was not field preempted and engaged in a conflict preemption analysis. Now, in that case, they found that there was a conflict. But unlike Section 6 or unlike Section 5C, what we've done here, and again, removability in the federal context, is several. Illegal reentry, 8 U.S.C. 1126, is a federal crime. The state crime is also a crime. And while that was an issue relating to Arizona's Section 3, that was field preempted due to the unique nature of alien registration. That was not something that the U.S. Supreme Court found relating to Section 5 or Section 6, despite both of those arguments being presented to the court. So our response is the Supreme Court was presented with field preemption in a context that touched on removability, and it declined to apply field preemption. And it's the burden on my very able colleagues who have pointed out numerous potential ways that this law could be applied in a way that conflicts with federal law or the Constitution. But the state hasn't had an opportunity to try to enforce this law in a manner consistent with the federal laws and Constitution. And it should be able to do so because it can do so. And unless every application of the law is unconstitutional, the facial injunction entered by the district court below is improper. A couple other points to touch on. One is at the point at which this court is thinking about how enforcement might be relevant, we've left the area of field preemption entirely. At that point, if any type of enforcement is lawful, a facial injunction is inappropriate. When it comes to irreparable harm, the state believes that none of the individual plaintiffs face irreparable harm because they can't be prosecuted under the statute. What about the one, the one you say probably doesn't live in Iowa? Is it David? Help me remember. Yeah, so the state of Iowa, given the facts that are pled in the complaint, don't know whether he would be removable. The district court found probably so, right? The district court found probably a resident of Iowa, correct? He credited the statement in the briefing that he was a resident of Iowa. And if he is a resident of Iowa that has previously been removed and is in the country illegally, then he can be prosecuted. Thank you. When it comes to associational organizational standing, I'm not entirely clear on the difference between the two. We think MMJ needs to do more to show that its members are at risk of prosecution if they want to assert organizational or associational standing on behalf of those members. We'd counsel this court to look at the recent Supreme Court precedent on organizational or associational standing, which we believe limited the availability of that to very narrow circumstances. And as the MMJ plaintiffs agreed, I believe on remand, the direct issue could be resolved. Do you think our circuit precedent is to the contrary of the recent Supreme Court cases you're talking about? No, Your Honor. I think it's fairly consistent. I think that the recent Supreme Court case clarified perhaps some edge cases. And for organizations that are looking to assert standing, it explained exactly what steps need to be taken for them to do so. I don't believe that that's inconsistent with this court's precedents, but I do think it's a helpful reminder. It's complementary in the same way that the GLBT youth case is complementary to Moody v. Net Choice. And ideally, how Iowa's enforcement of its own state illegal reentry section is going to be complementary with federal law as well. And ultimately, that's what this comes down to, is the state of Iowa listened to the various cries from across the political spectrum. President Biden described what's going on as a crisis. There is clearly a problem, and it's a problem that affects Iowa. And so Iowa passed a state law. And unless this court believes that every application of that law is preempted by federal law, the district court's injunction should be vacated. And I'll just close on one note because I don't think we've touched it today. My friend on the other side questioned our lack of response to their 28-J letter. Our reply had not yet been due. Page 15 and 16 of our reply brief touches on how we distinguish the United States against Missouri. We believe that deals, again, with the traditional equitable principles that aren't at issue in this case. And I'd strongly encourage the court to read the language of Armstrong, which seems to make clear that the Supremacy Clause is not an independent font of the cause of action. And finally, I would just encourage this court, as it did in GLBT Youth, to apply Iowa Code Chapter 4 to Iowa's law and to vacate the injunction below as improperly overbrought. Thank you. Thank all three counsel for the argument. And cases number 24-2263 and cases 24-2265 are submitted for decision by the court.